Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Good morning Judge Rosenbaum and I are pleased to welcome our colleague from the Southern District of Florida Chief District Judge Michael Moore to sit with us today and Friday. It's not the first time Chief Judge Moore has sat with us and we appreciate his willingness to do so again and and to add this this work assisting us to his regular duties in the Southern District of Florida and particularly as Chief Judge. So thank you  Thank you, Chief. Good to have you here. We have four appeals to hear this morning. Counsel we're familiar with your cases. We've read your briefs, the authority cited in your briefs, at least portions of the record. So you have limited time this morning. You should feel free to get straight to the heart of your argument. You don't need to familiarize us with your case or its background. We know what your case is about. We're probably going to have some questions. But do listen out for the courtroom deputy to tell you when your time is about to expire and be mindful of that. If you're finishing an answer to a question from the court, of course, you can finish that answer even though your time has expired, but do try to wrap it up. And if you have rebuttal time, you'll still save that. So our first appeal this morning is Sabal Trail Transmission versus Thomas. Mr. Harris? Yes, Your Honor. Are you ready? Yes, sir. Very good. May it please the court. My name is Bruce Harris, and I represent Sabal Trail Transmission in two appeals before you today. As a matter of supremacy, when the federal power of eminent domain is exercised, the standard of compensation owed is the Fifth Amendment's just compensation standard. And there is no choice of law regarding the applicable standard. I'm sorry, counsel. Let me ask you a question about that. Why does it matter in this case? Because the jury instructions, if it had been under fair compensation or just compensation, were the same anyway, and you all did not object to the jury instructions. So why does it matter to the trial in this case? Judge Rosenbaum, the standard of compensation was made a feature of the trial in this case, and Sabal Trail did object to the jury instructions and proposed that the standard be just compensation, not full compensation. That objection was overruled by the district court. But the substance of the instructions, you did not object to. You object to the name or the description, that is just compensation instead of fair compensation. But even if you had put in, even if it had said just compensation, what the jury was deciding on, that is the instructions that they actually used to reach their decision, would have been the same regardless as far as what the verdict was that they returned. Well, we didn't agree with the terminology of the standard Florida jury instructions regarding making the owner completely whole. But my question is more of a practical one. How did that affect what the jury was deciding? Well, as I said, it became a feature of the trial, and in fact the counsel for the landowners said that there was a difference between just and full compensation, that full compensation was more robust, entitling the owner to be made completely whole. The problem with that is that there was never any explanation of what that difference was. And when the jury was instructed about the substance of full compensation, it was instructed that full compensation includes the fair market value of the property taken plus whatever damages result to the owner's remaining lands as a result of the taking. That's the same substance of what the instruction would have been had it been called just compensation. Well, Your Honor, the instruction, one of the instructions, went on to say that market value is a tool that can be used for determining the full compensation, but the object should be to make the owner completely whole, and that's different than the just compensation standard that Sable Trail believed should have been used and argued should have been used. So it did matter in the outcome of the jury, and the district court erred in treating the standard of compensation as a choice of law and applying Florida's full compensation over the Fifth Amendment's just compensation standard. Sable Trail undoubtedly exercised the federal power of eminent domain, and as a matter of supremacy, no state law, including a state constitution, may limit that federal power of eminent domain. So Florida's full compensation standard only applies when the state power of eminent domain is exercised. When the United States... Counsel, let me just take you back for a moment to the initial question. How specifically do you think the verdict would have been different if it had said just compensation instead of fair compensation? Well, I can't quantify what the jury may have done, so I can't answer that question. How can you establish prejudice then? Because the verdict was clearly based on the wrong standard, and the standard full compensation was argued to be a greater standard, a more robust standard than... Let's go back. Just because the wrong label was used, that is, the phraseology was full compensation as opposed to just compensation, I don't think it's going to get you there, counsel. You've got to explain how it made a difference here, how it caused prejudice to your client, and without any explanation of what the difference would be, or without any explanation of how the substance of the instructions would have differed, I just don't see how your client was prejudiced, even if there was an error. Well, respectfully, your honor, the prejudice was in the wrong terminology being used, and the suggestion that the Florida standard is more robust than the federal standard requiring... But the jury was never told that. The jury was never told how it was more robust. It was never told under Florida, full compensation, the full compensation standard, you would get X, Y, and Z, versus under a federal standard of just compensation, you would only get, say, X and Y. There was no explanation like that, and when we look at the jury instructions, it's hard to see how the substance of them was wrong. You know, no matter what the label was, whether it was called just compensation or full compensation, if what they were told the definition was, or how to arrive at an award, was the same, I'm failing to see what difference it made. Well, perhaps part of that prejudice, I think, can be seen in the closing argument when the landowners said that the full compensation requirement that the owner be made completely whole as different than the just compensation standard should apply because they were failed. Immediately after saying that, in an argument, counsel explained, quote, the important phraseology is that full compensation includes the fair market value of the property to be taken and any damages to the remainder of property, which is the very standard the district court used to instruct the jury, and to which your client lodged no objection. But he also said that the owner must be made completely whole and that because Sable Trail is a private entity, they should be held to this more robust greater standard than the just compensation standard. Sable Trail is also objected to the owner testimony that was submitted and was the basis for the jury verdict when it came to severance damages. This case is different than the Thunderman case where the circuit court allowed the owner testimony because there the owner's lay opinion testimony was based on personal knowledge of property over 25 years and 25 different properties, where here the basis for the specific quantification of severance damages was, in the case of Lee Thomas, just based on the award that he wanted to get. Well, I thought Lee had trained as a land appraiser early in his career and both men, both Lee and Ryan, had bought and sold property in the county over the years and knew what purchasers would be looking for in a piece of property. Right? I think that there was evidence to that effect, Your Honor, but the basis for Lee's opinion was that he wanted a million dollars and he worked backwards to get to 12% severance damages to the entire remainder and it was a value-to-me standard that is not based on personal knowledge in the sense that is required for 701 lay opinion testimony, and in fact, it's something that courts have said is not permissible in an imminent domain case. The value can't be based on what the owner would like to repeat. The real question is whether the jury could have credited it. You could certainly cross and examine about that and try to undermine the credibility of that testimony, but the real question is whether the district court heard in admitting the testimony, and it looks to me like each of the witnesses had at least enough experience with real estate in the area to provide some opinion testimony. Your Honor, I agree that they did have experience that would allow them to provide opinion testimony, but not opinion testimony specifically quantifying a diminution in value as a result of the thesement. That's beyond what is contemplated for lay opinion testimony under 701, and I see that my time is up. Okay, we'll hear from Mr. Brigham. Mr. Harris, you've saved four minutes for rebuttal. Good morning, Your Honors. Andrew Prince Brigham here along with co-counsel Thor Hearn for the appellee landowners. If I'm jumping right into the most critical points, we were hopeful on behalf of our clients that the court might consider exercising discretion and using pendant jurisdiction to address both issues on appeal. If I look at the first, and we did so because we thought it was a fitting final chapter to the framework that you, Judge Pryor, had kind of set forth in some prior decisions that you made both in the Black and Whittington case and the Carbone versus CNN case. We thought that our case here was distinguished from the earlier case of Sable Trail 3.921 acres decided earlier this January, the Sunderman case, in that there was an issue that was inextricably intertwined, a non-appealable issue, and that would be the the use of the jury instructions that relied on state law. If that is the avenue by which the court would consider the choice of law issue, let me speak to that, and then I'll address the second issue, which is the owner's testimony. As to the choice of law issue, I really look most carefully at the decision of Georgia Power, the Fifth Circuit decision in 1981, and I think the starting point is very critical. In fact, the court found that the starting point when Congress enacts a statute that authorizes... I want to make sure I understand what you're arguing. Are you arguing about the attorney's fee award? Your Honor, I think at this point, the choice of law issue ties to the entitlement of attorney's fees, yes, but it would also tie... But there's been no actual award and determination of the amount of award, the amount of the award of attorney's fees and cost here, right? Absolutely. The court... It seems to me that comes squarely within our ruling earlier this year. Yes, sir, except for the instance of the jury instructions also relying on the choice of law issue. And I see from the questions that were given to Mr. Harris that that the court may be inclined to see that there was no substantial difference between the just compensation measure under federal law and the state compensation measure. Yeah, but that doesn't tell us whether... We don't have... We don't have, though, a determination of attorney's fees and cost, and in the absence of that, I don't see how we get to the review of that award. I understand, Your Honor. I understand that the court's framework here is to keep separate train tracks for the merit issue that would engage the jury verdict in the final judgment and the attorney's fee issue, which the work of the court is not yet complete. Two separate train tracks, final decision on the merits, not a final appealable decision on the amount of attorney's fees. The only tie or overlap is that the choice of law... It's not enough, counsel. At least speaking for me, it's just not enough. I mean, Your Honor, we don't have a final award on attorney's fees and cost, and this jury instruction, which is, as best I can tell, the substance of which was the same no matter what label was used. I don't see how that gets you there. I see, Your Honor, and we would only prefer to have the matter decided in a final format under this appeal, as opposed to bouncing back at some time in the future that would take up judicial resources and the resources of the party. And that was the argument we heard earlier this year. Yes, sir. If moving specifically then to the questions that the court gave Mr. Harris, I think the court's best view of this case is that there was no harmful error, whether you use the state jury instructions or the federal jury instructions. The difference, perhaps Mr. Harris is pointing to, is that Florida's full compensation standard gives a picture of making the owner whole, and that fair market value isn't an exclusive tool of measurement, but the jury certainly is instructed to consider fair market value as a helpful tool. In that rubric, I think the jury made a solid decision here, and I also believe, as to the second issue, that there was absolutely no abuse of discretion by Judge Walker or Judge Huck in the administration of this case. Those two judges, and particularly Judge Walker's order below denying a new trial, gives a play-by-play of how the court considered whether there was a strong enough, sufficiently strong enough, foundation for the owners to give testimony. And both Judge Walker, during the court trial, had established the parameters in which he would consider, or the trial judge should consider, what would be sufficiently admissible as a foundation. Judge Huck, during the course of the trial, heard both bench arguments and proffers, and then heard the testimony. There was no contemporaneous objection to what was objectionable that Sable Trail has issued on appeal. There was no opportunity for curative instruction. But really, when it comes down to it, this case is very much looking at the trial judge who's there to have to make the calls between what's a ball and what's a strike. And after the ballgame, if we try to go back and, you know, look at each decision that the trial court made on whole and in context, I think Judge Walker said it well. Sable Trail is only highlighting those very questionable calls, but they're ignoring that we had a complete trial that allowed both sides fair opportunity to present their cases. I think it's very important for the court to understand that if there's any allegation that testimony was speculative or didn't have a substantial basis in market data, that is more lodged against the Sable Trail Pipeline Company, who put on an appraiser who testified to zero damages on the basis of only having two pairs of data, pairings of impacted property with non-impacted property to arrive at an opinion, paid 2.4 million dollars, two pairs, and a zero percent damage. This was an 837 acre farm with a 40 acre home site where the farmer had his house and his guest house. The pipeline was over a mile long. It cleared a corridor of a hundred feet, clear-cutting trees and going through the fields. It went through a grove of trees, mature oaks, and removed 25 and left in its path a noticeable airstrip looking clearing, which was marked by a pipeline in orange marking saying warning every so often in the line of sight. No damage for removing those oak trees that were framing a beautiful pond next to the home and land for which the owners paid a premium of $20,000 compared to the other assembled pieces of the farm, which averaged $5,000 an acre. The pipeline corridor also went diagonally through the farmers fields. The farm grew watermelons, primarily, and peanuts. When you irrigate for a watermelon, it's very important that the soil content on and throughout the field is the same. The pipeline construction disrupted that. Pictures showed the jury that the crops growing within the easement area were a different color and and had different water characteristics in the soil than the the field around it. Very difficult to program a computerized drip line where you have a diagonal cut through the field. All of that, again, zero damages from Sable Trail. The owner's testimony was in two-fold. It included the appraiser, and it included the owners themselves. The appraiser on the farm... Yeah, the only objection here, as I understand it, I've been listening to all of this and trying to figure out how it pertains to the issue we have to decide. The only argument is that the district court erred in admitting your client's evaluation testimony. That seems to me they get over the low hurdle for the admission of that kind of testimony, but that's all we're really talking about, right? Yes, Your Honor, and an owner doesn't need any further qualification because he's familiar that court and the case law here deems an owner to be able to give an evaluation opinion of his own property, both before taking and after taking. Yes, there has to be some basis for it, but, I mean, these were individuals who both had bought and sold real estate, one of whom had been trained as a land appraiser. They had a basis, as I understand it. Yes, Your Honor, and that was made clear to Judge Huck, and in their testimony, and the jury heard that and decided to either reject or accept their opinions, but absolutely, these were owners that testified that they had assembled the very farm in 2003 to 2006, buying each piece at different prices, and these both Lee Thomas, the father, did have the appraisal training, although his career was in business, and he bought and sold other lands besides the farm. That was made clear to the jury. The testimony on the damages from Lee included the fact that he felt that the pipeline compromised the exclusivity of the property. There was a loss of security. There was a loss in the productivity of the crops because of the diagonal cut of the corridor through the farmer's fields. His son, Ryan, is a certified crop advisor, someone that advises other farmers on 40,000 acres of land in Florida, and he was very familiar with the improvements made to the property after purchase. Some of the appraisers did not consider the improvements that were made by the farmer to the condition of the land or to the improvements of the home in the guest house. All of that was testified by Ryan Thomas, and the jury apparently felt that that was persuasive. So again, we're dealing in an instance where the question is, was there a sufficient foundation? And Judge Huck and Judge Walker believed that there were. They distinguished the two cases that were cited by Sable Trail, the first of the 11th Circuit decision in Williams v. Mosaic, where the owner testified without any market basis, and actually the owner testified to zero damages, saying her home was completely worthless. She said it had no value, but she was also aware of other properties that sold in the neighborhood nearby where she was complaining that the proximity to a factory and its use had devalued her property completely. So that case is highly distinguishable because in this instance, the owners had sufficient foundation. With the other case, it was a Northern District of Alabama decision in U.S. v. 6.09 acres. In that case, if the court reads through the facts, there was absolutely no reference to any market data. So experts were giving opinions without any pointing to sales that were either impacted or non-impacted, which is kind of the standard damage study that takes place in these proximity cases. That was not done in 6.09 acres, and owners were given opinions that had no basis in terms of looking at other properties and what their sale prices were. That's different from our case, where our client's testimony was in line with the range of percentage losses that the appraiser who had done a study had also prepared. In this case, the appraiser for the owners had 54 pairings of impact and non-impacted properties, and if looking at the size of the property, looking at this remaining... of the pipeline as it affected the remainder, all of those elements were considered in assigning a percentage loss. The owners here for the 837 acres opined to a 12% damage, the appraiser opined to an 8% damage, the jury awarded a 9% damage. As to the home, 40 acres, the owner testified to a 60% damage, the appraiser testified to a 45% damage, and the jury arrived at a 50% damage figure. In the jury instructions, the jury was advised that they could have a verdict that was between the highest testimony of value given or the lowest, and that's what they did. So this is a case that I think the court, particularly Judge Huck, Judge Walker, should be commended. They did an excellent job, and we had a fair day in court for both sides, and we have a final verdict. Okay. Thank you, counsel. Mr. Hughes, you've got four minutes. Your Honor, thank you. The standard of compensation became the center point of the trial. It was referenced nine times in the opening statement. Full compensation was referenced another 11 times during the presentation of the evidence, and multiple times during the closing. And as I've already articulated, the argument was made that Sable Trail was responsible for paying more than just compensation, more than what was required under the law, because it was a private entity. And the combination of those factors, along with the actual instruction that was given, the jury instruction, requiring full compensation, that the owner be made completely whole for the loss, and that the full compensation guaranteed by the Florida Constitution would make him completely whole for the loss, became a feature of the trial. And that standard was not the right standard, and it affected the verdict. I can't quantify how it affected the verdict, but there's no question that it was a feature of the trial. Let me ask you this. You don't have to quantify it, but what ingredients of the verdict were there that wouldn't have been a part of the verdict if just compensation, that terminology, had been used? Part of it is the testimony of the owners themselves, because the owners were allowed to testify regarding items that were... Well, let's assume for this answer that that testimony was admissible. The testimony was admissible, but the standard would have remained just compensation, and the market evidence was what was presented by the appraisers. And so the only evidence of market evidence that could have supported... Well, it couldn't have supported the verdict, because it was below what the the owner's own expert number, market evidence, was below what the owners claimed, and what the verdict ultimately came in at. So... Even if... I'm sorry. Why is it not the case, though, that things like, for example, the difference in the soil quality, and therefore the difference in the crop viability, and actually, virility, I guess, of the crop... Why isn't that part of the market doubt? Well, with respect to that specific issue, Your Honor, that was for the area of the property that was actually taken, the easement area. And Sable Trail paid for the value of that property, and so any diminution to that easement area was paid for and would have been included in the part taken. Not in damages or severance damages to the remainder, which is the area that went beyond what the market evidence was. And... What about... What about the idea of having people walk on your property at any time, not knowing when they're coming, not knowing when they're going, having differences to your privacy, and having differences to your view? Why isn't... Why aren't those things fair components of fair market value? Your Honor, those are components that could be admissible to support a diminution in value in general. In fact, Judge Walker suggested that, and I see my time is running out. May I finish my answer? You may, but wrap it up. Judge Walker acknowledged that general feelings of diminution in value, there might be sufficient foundation, but specific quantification would require a greater foundation, which was not present here. Okay, I think we understand your case, Mr. Hughes. I mean, Mr. Harris. I apologize.